**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

| | |
|---|---|
| TINA C., <br>     Plaintiff, <br><br> v. <br><br> COMMISSIONER OF SOCIAL <br> SECURITY, <br>     Defendant. | Case No. 1:19-cv-01155-JES-JEH |

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 15) and the Defendant's Motion for Summary Affirmance (Doc. 18). This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

Tina filed an application for disability insurance benefits (DIB) on September 9, 2015 and an application for supplemental security income (SSI) on December 30, 2015, alleging disability beginning on March 1, 2015. Her DIB and SSI claims were denied initially on March 31, 2016 and upon reconsideration on August 18, 2016. Tina filed a request for hearing concerning her applications which was held on December 21, 2017 before the Honorable Robert V. Luetkenhaus (ALJ). At that hearing, Tina was represented by an attorney and Tina and a

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears at (Doc. 10, 11) on the docket.

vocational expert (VE) testified. Following the hearing, Tina's DIB and SSI claims were denied on April 17, 2018. Her request for review by the Appeals Council was denied on February 3, 2019, making the ALJ's Decision the final decision of the Commissioner. Tina filed the instant civil action seeking review of the ALJ's Decision on May 3, 2019.

## II

At the hearing, Tina was 50 years old and lived with her husband in an apartment. She claimed the following conditions limited her ability to work: depression; bipolar disorder; irritable bowel syndrome (IBS); migraines; vertigo; seizures/epilepsy; loss of balance; memory loss; sensitivity to light; and kidney stones. AR 275. Tina testified she previously worked as a trainer and planner for disabled adults, as a referral specialist, a receptionist, and an optician, and she also worked in patient billing, insurance billing, and medical records.

She said her bipolar depression kept her from working. Her depression caused her to isolate herself in her home, she became suicidal, and she did not go to her doctor because she did not feel well enough. When she was manic, she could not concentrate or focus, her mind raced constantly, and she engaged in risky behavior such as overspending. She said she experienced depression and manic phases in cycles which could last up to three months. The medication she was prescribed for her depression and anxiety helped her though it did not take away all of her symptoms. She said she took her medicine all the time like she was supposed to. Side effects from her medication included drowsiness and feelings of sedation. She said her medication took the edge off. Tina testified her irritable bowel caused her to use the bathroom "maybe five times a day." AR 64. It also caused her back pain due to her bloating stomach and diarrhea.

Tina testified she had no physical problems that would interfere with her ability to walk, stand, sit, lift, or carry things. She cooked and was able to follow

recipes. She did a lot of baking when she was manic. She grocery shopped, did the dishes, vacuumed, and cleaned the bathroom. She said when she was depressed, she was unable to do those things.

Upon questioning by her attorney, Tina testified that her medication to treat the cycles from manic to depressive "does change it and turn it, reverse it." AR 68. She explained that her counselor taught her for the last few years how to live with her bipolar condition. She said when she became extremely depressed, she "normally" went to Methodist Hospital and had done so twice in 2017. Each of those times she had been depressed for more than a month.

Tina stated she did not have a pseudo seizure in three years and confirmed they were under control with medication. She said she had migraines up until the last month and was now on migraine medication. Before the medication, Tina said she experienced migraines every two weeks which lasted two days or more. Her medication "sometimes" helped with her anxiety. AR 71.

The ALJ then questioned the VE. The ALJ asked whether the following hypothetical individual could perform Tina's past relevant work:

> [A]n individual 48 to 50 years of age who has completed 12 grades of education, has the same past relevant work as we've just identified.
> This individual retains the ability to do medium work, but this individual can only frequently climb ramps and stairs; can occasionally climb ladders, ropes and scaffolds. This individual must avoid even moderate exposure to hazards such as moving machinery and unprotected heights.
> And this individual can perform only simple, routine and repetitive tasks and can make only simple work-related decisions.

AR 75. The VE answered in the negative. The VE then testified there were three unskilled medium level jobs the hypothetical individual could do, as well as three unskilled light level jobs the individual could do. The VE further testified that there would still be light and medium jobs that could be done by that hypothetical

3

individual who could only occasionally tolerate contact with coworkers, supervisors, and the general public. Only the number of positions available would be reduced by 20 percent. However, if that hypothetical individual would need to take up to three unscheduled breaks that lasted five minutes each during an eight-hour shift, the identified jobs could not be done because the individual would likely be off task beyond the tolerable rate for competitive employment. AR 77. If the hypothetical individual was absent from work three times per month, the individual could not maintain competitive employment.

### III

At Step Two, the ALJ determined Tina had the following severe impairments: bipolar disorder; generalized anxiety disorder; IBS; and alcohol abuse. AR 24. The ALJ explained that while he did not include seizures, sleep apnea, or musculoskeletal conditions as severe impairments, he considered all of Tina's impairments, both severe and non-severe, in determining her RFC. He also determined that Tina's migraines were not a medically determinable impairment. At Step Three, the ALJ considered whether the "paragraph B" criteria were satisfied in his consideration of Tina's mental impairments. He found: moderate limitation in the broad functioning area of understanding, remembering, or applying information; moderate limitation in the area of interacting with others; moderate limitation in the area of concentrating, persisting, or maintaining pace; and mild limitation in the area of adapting or managing oneself. At Step Four, the ALJ made the following residual functional capacity (RFC) finding:

> [T]he claimant has the [RFC] to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she but [sic] can only frequently climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, must avoid even moderate exposure to hazards such as moving machinery and unprotected heights, can perform only simple, routine and repetitive tasks and can make only simple work

related decisions, and can only occasionally tolerate contact with coworkers, supervisors, and the general public.

AR 27.

The ALJ considered Tina's testimony, medical records pertaining to her physical impairments dated between March 2015 and August 2017, medical records pertaining to her mental impairments dated between February 2015 and January 2017, opinion evidence, and the statements of Tina's aunt and uncle. The ALJ listed Tina's complaints throughout the relevant time to include: abdominal pain; loose stools; hyperactivity and impulsivity; poor motivation; lack of pleasure and isolation; a history of suicide attempts; suicidal thoughts; depression; paranoia; anxiety; she did not like her medication due to weight gain in April 2016; irritability; she was not doing well in May 2017 as her husband had cancer for the fourth time; and chest pain. The ALJ also listed Tina's reports that: she was doing okay; in May 2015 her bloating, pain, and cramps were gone; she was feeling good more often and not isolating herself; she had very little anxiety; her medication was working better; therapy was helpful; she was sleeping well and her anxiety improved; in March 2016 she was doing better than she had in a long time and felt normal; she was not doing too badly; and she did not want to change medications. The ALJ also detailed treatment notes that Tina: was cooperative with good insight and judgment, intact memory and attention; had normal gait, muscle tone, and strength; had normal mood, affect, and memory; had fair insight and judgment; had intact memory and was distractible; had questionable judgment/insight; and had a stable mood.

The ALJ gave "no weight" to the May 2017 and October 2017 assessments provided by Advanced Practice Nurse Renae Milhoan, Tina's mental health provider, who endorsed extreme limitations in nearly all domains of functioning. AR 33. The ALJ gave "some weight" to the September 2017 opinion of Daniel

Martin, M.D., who opined as to Tina's IBS and provided, among other things, that Tina was limited to standing four hours per day. *Id*. The ALJ gave "great weight" to the State Agency doctors' opinions "to the extent they found the claimant's impairments do not meet or equal a Listing and are not disabling." *Id*. The ALJ continued:

> However, the actual [RFC] determined herein is based on all the evidence of record including evidence not before the State Agency. Their findings that some of the claimant's impairments are severe (i.e., seizure disorder and degenerative disc disease) is inconsistent with the longitudinal treating history as summarized above, including the claimant's testimony she has not had a pseudo seizure for over three years and her extremely sporadic treatment for any musculoskeletal conditions since the alleged onset date.

*Id*. Lastly, the ALJ found Tina's aunt and uncle's statements concerning the intensity, persistence, and limiting effects of Tina's symptoms not consistent with the objective medical record, Tina's actual activities, and her statements to her doctors that her symptoms were generally stable and well controlled. Their statements were "not given great weight." *Id.*

### IV

Tina argues: 1) it was legal error for the ALJ to give no weight or some weight to the opinions of Tina's treating providers who are specialists and to give great weight to parts of the State Agency consultant opinions that did not consider the complete medical record; 2) Tina's bowel condition, while noted severe, was not accounted for in the RFC finding; 3) while routine activities of daily living and limited babysitting are cited as evidence in the ALJ opinion in support for Tina's ability to perform full-time work, case law has cautioned that an ability to do these activities does not lead to a conclusion a person is not disabled; 4) the ALJ Decision mentions a few times Tina's compliance with psychotropic medication regimen as an issue, but caselaw has found that difficulty in following a treatment plan can

6

be a symptom of mental illness itself; 5) the ALJ Decision reverses State Agency findings in that several of Tina's severe impairments are instead found non-severe impairments, and migraines found severe at the State Agency level are found a non-medically determinable impairment in the ALJ Decision which is legal error, and the limitations of these impairments were not included in the findings of RFC as is necessary; and 6) limitation to sustained work that involves simple, routine and repetitive tasks is not a panacea to findings of limitations in concentration, persistence or pace.

## A

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for

disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520; 416.920.[2] In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe and meets a durational requirement, or suffers from a combination of impairments that is severe and meets the durational requirement;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

---

[2] The standards for establishing a disability in order to receive DIB and SSI are materially the same. *Compare* 20 C.F.R. § 404.1501 *et seq.* (DIB) *with* 20 C.F.R. § 416.901 *et seq.* (SSI). Thus, the Court may at times only cite to the DIB regulations.

*Id.* An affirmative answer at steps 3 or 5 leads to a finding that the plaintiff is disabled. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. *Id.* However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

In the instant case, Tina claims error on the ALJ's part at Steps Two and Four.

## B

## 1

Tina argues that a "principal issue[]" with the ALJ's Decision is that it afforded no weight or some weight to the opinions of Tina's own treating providers, and there are no medical opinions contrary to her treating providers' opinions covering the period following the State Agency opinions. The Commissioner argues that the ALJ gave good reasons for giving some weight to treating Dr. Martin's opinion and no weight to treating APN Milhoan's opinions. The Commissioner emphasizes that the regulations make clear that the determination of a claimant's RFC at the administrative level is the ALJ's responsibility alone.

Tina's arguments with regard to the ALJ's consideration of the medical opinions of record do somewhat lose sight of the fact that it is ultimately for the Commissioner to determine a claimant's RFC. *See* 20 C.F.R. § 404.1527(d)(2) (providing that the final responsibility for deciding a claimant's RFC is reserved to the Commissioner). 20 C.F.R. § 404.1527(c) provides:

> How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating

source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.

The listed factors include: 1) examining relationship; 2) treatment relationship, which in turn includes length of the treatment relationship and the frequency of examination, and the nature and extent of the treatment relationship; 3) supportability; 4) consistency; 5) specialization; and 6) other factors brought to the Social Security Administration's attention. *Id*. An ALJ must give controlling weight to the medical opinion of a treating physician only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2).[3]

As for the ALJ's consideration of APN Milhoan's two Medical Source Statements, to which he gave no weight, the ALJ explicitly pointed out that Milhoan was Tina's mental health provider. Nevertheless, the ALJ explained Milhoan did not provide citations to any objective medical findings including mental status examination findings to support the opined-to extreme limitations. Elsewhere in the Decision, the ALJ discussed Tina's mental health appointments with her psychiatrist Ghassan Bitar, M.D. and Tina's therapy sessions. She was, at various times, cooperative with good insight and judgment, she had intact memory and attention, had fair insight, had normal recent and remote memory, had fair attention, had appropriate affect, and had questionable judgment/insight. At medical visits for physical complaints in March and May 2015, Tina's mood and affect were normal. The ALJ noted that Tina "presented regularly" to her doctor and therapist for treatment of her mental health symptoms and their treatment

---

[3] The treating physician rule found in 20 C.F.R. § 404.1527 has since been eliminated by the Social Security administration. However, the rules in § 404.1527 apply to claims filed before March 27, 2017.

records "in fact show that her symptoms are generally stable and well controlled when she is compliant with taking her medications." AR 31. The ALJ explained further that Milhoan's opinions of Tina's extreme limitations were inconsistent with Tina's actual activities, citing Tina's ability to babysit her grandchildren twice a week for an extended period of time and her ability to shop at the grocery store independently. Finally, the ALJ discussed that while Milhoan opined Tina had four or more episodes of decompensation, treatment records did not show several hospitalizations or ER visits for mental symptoms nor significant alterations in medications on at least four occasions. The foregoing reveals the ALJ was aware of and considered several of the Section 404.1527(c) factors including Milhoan's treatment relationship with Tina (the frequency too), her specialty as Tina's mental health provider, the consistency of her opinions with the record as a whole, and the supportability of her opinions. *See Schreiber v. Colvin*, 519 F. App'x 951, 959 (7th Cir. 2013) (unpublished) (deciding the ALJ sufficiently accounted for the factors in 20 C.F.R. § 404.1527 even though he did not explicitly weigh each factor where his decision "makes clear that he was aware of and considered many of the factors").

As for the ALJ's consideration of Dr. Martin's opinion, to which he gave some weight, the ALJ noted the opinion was with regard to Tina's IBS. The ALJ explained that Dr. Martin did not adequately support his limitation with citations to objective findings. Tina does not articulate how the ALJ's explicit consideration of more of the factors would support a determination to give more weight to Dr. Martin's opinion. Notably, Dr. Martin's Medical Source Statement left both the "Frequency and length of contact" and "Prognosis" lines blank and just *one* treatment record bears his name – an August 29, 2017 visit – at which time Dr. Martin assessed Tina with "IBS-D. Main symptom burden today is nausea, bloating. She is concerned about the intermittent emesis . . . Encouraged dietary and lifestyle medication." AR 1112. The plan for Tina at that time was, among

11

other things, to continue her fiber intake, "Ongoing lifestyle modification based on clinical response to food-stuff," and follow up in six months. *Id*. While Tina testified she needed to use the bathroom five times a day due to IBS, Dr. Martin opined Tina would sometimes need to take unscheduled restroom breaks just two to three times a day. Earlier in his Decision, the ALJ directly addressed Tina's physical impairments, namely, her treatment for abdominal symptoms and concluded the records did not reveal disabling symptoms. In his discussion of the records pertaining to Tina's abdominal symptoms, the ALJ included that Dr. Martin "advised [Tina] to treat her symptoms with dietary and lifestyle modification . . . no surgery or other aggressive treatment has been recommended[.]" AR 31. Contrary to Tina's argument, it is clear how giving Dr. Martin's opinion "some weight" bore on the outcome of the ALJ's RFC finding; he did not outright reject Dr. Martin's Medical Source Statement in which Dr. Martin listed the diagnosis of IBS with diarrhea, but neither did he accept the extent of functional limitation to which Dr. Martin opined Tina's IBS would cause.

Tina further argues with regard to her IBS that it was not accounted for in the RFC and takes issue with the fact the ALJ did not inquire further at the hearing as to how long her trips to the bathroom were or if she had good days and bad days. She points to the VE's hearing testimony that the hypothetical individual who would need to take up to three unscheduled breaks that last five minutes each during an eight-hour shift could not perform the identified jobs or any other jobs, the VE's hearing testimony that there would no jobs available to someone absent three days a month from work, Dr. Martin's opinion that Tina would miss four days of work per month, and treatment notes which indicated Tina experienced loose stools.

12

"An ALJ must articulate, at least minimally, his analysis of the evidence so that this court can follow his reasoning." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004).

Here, the C0078ourt can easily follow the ALJ's reasoning as to Tina's abdominal symptoms. The ALJ discussed the evidence of Tina's complaints of abdominal pain, loose stools, bloating, cramps, and nausea. Nevertheless, the ALJ pointed to the following record evidence in support of his conclusion that the records did not reveal disabling symptoms: Tina's doctor noted in early 2015 that her EGD and colonoscopy were essentially unremarkable; it was noted on different occasions that Tina had significant relief with Bentyl; she did not follow up for any abdominal symptoms for a year ("this significant gap in treatment is not consistent with someone experiencing ongoing and disabling symptoms"); dietary and lifestyle modifications were advised rather than surgery or other aggressive treatment; and Tina did not have documented episodes of dehydration or weight loss "that would be expected from someone experiencing disabling gastrointestinal symptoms." AR 31. The ALJ then explained Tina was limited to medium work with frequent climbing ramps and stairs, and occasional climbing ladders, ropes, and scaffolds "to account for her abdominal symptoms but has not demonstrated further limitation." *Id*. That final statement does away with Tina's contention that the ALJ did not indicate how her IBS was accounted for in the RFC. Tina otherwise does nothing more than list in her brief the evidence the ALJ discussed in his Decision, and she highlights a portion of the VE's testimony. From the way she presents her argument, Tina essentially asks the Court to re-weigh the evidence. *See Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (explaining that in reviewing an ALJ's decision, the court cannot reweigh evidence, resolve conflicts in the record, decide questions of credibility, or otherwise substitute its own judgment for that of the Commissioner).

13

Tina faults the ALJ not only for affording great weight to parts of the State Agency doctors' opinions that did not consider the complete medical record, but also for "revers[ing]" the State Agency findings as to her severe impairments. She also argues the limitations caused by those impairments were not included in the RFC finding as was necessary. The Commissioner argues the ALJ explained why the evidence did not support certain impairments as severe or medically determinable but assessed the same limits on functional capacity as did the State Agency doctors anyway, thus, Tina's criticism has no practical impact on the ALJ's Decision.

The Court agrees with the Commissioner. As an initial matter, "Step two is merely a threshold inquiry; so long as one of a claimant's limitations is found to be severe, error at that step is harmless." *Ray v. Berryhill*, 915 F.3d 486, 492 (7th Cir. 2019). Even assuming the ALJ erred at Step Two, the error was harmless where the ALJ determined Tina had the severe impairments of bipolar disorder, generalized anxiety disorder, IBS, and alcohol abuse and continued to Steps Three through Five. More importantly, the ALJ succinctly explained the reasons he found Tina's seizure disorder, sleep apnea, and musculoskeletal conditions non-severe and her migraines non-medically determinable, and he provided substantial support for those findings.

The ALJ explained he could not find seizures to be a severe impairment based on the lack of any treatment for them since the alleged onset date, the most recent testing and workup did not confirm any diagnosis of any seizure disorder, and the ALJ pointed out: Tina alleged having a seizure in August 2014, prior to the alleged onset date; her EEG in August 2014 was normal; the record did not reveal further treatment for any reports of seizures after August 2014; and Tina testified in 2017 she had not had a seizure/pseudo seizure for three years. The ALJ stated the following with regard to Tina's sleep apnea diagnosis:

> [R]ecords do not show reports of symptoms since the alleged onset
> date. Her doctor noted that she may have near resolution of her sleep
> apnea with positional therapy . . . In the complete absence of any
> subsequent medical records since the alleged onset date showing
> complaints or of [sic] treatment for related symptoms, it is reasonable
> to conclude that this condition has not resulted in any limitations on
> the claimant's ability to do work related activities and is a nonsevere
> impairment.

AR 24. In finding Tina's musculoskeletal conditions non-severe, the ALJ pointed
out that records did not show more than minimal functional limitation, including
imaging studies which showed only mild to minimal findings, a negative
rheumatoid arthritis workup, physical examinations which documented no more
than minimal functional limitations, an "extremely sporadic" treatment history for
pain, and the fact that no surgery, injections, or other treatment were
recommended. The ALJ repeated that Tina had already been limited due to her
IBS to medium work with the additional limitations set forth in the RFC, and,
"Even if she has established her musculoskeletal conditions are severe, she has not
demonstrated her [RFC] would be further limited." AR 24. The ALJ next explained
that under Social Security general policy, a claimant could not establish the
existence of any medically determinable impairment based solely on a diagnosis
in the evidence or on a claimant's reported symptoms. Rather, there must be
clinical signs or laboratory findings to support the finding. The ALJ detailed the
requisite clinical signs and laboratory findings and found, "In this case, the record
does not establish the appropriate clinical signs to warrant a diagnosis of
migraines; thus, this is not a medically determinable impairment." AR 25.

In fact, the Court finds Tina's argument in this regard almost frivolous as
illustrated by the foregoing. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 366 (7th Cir. 2013)
(concluding ALJ provided enough information to support "not severe" finding where
ALJ cited, among other things, the claimant's good response to medication).

15

Additionally, the ALJ's ultimate RFC finding incorporated limitations opined-to by the State Agency doctors who listed as severe impairments Tina's migraines and seizures. As the Commissioner puts it, any error in the ALJ's findings as to severe versus non-severe impairments "would have little or no impact on the outcome of the ALJ's decision." Dft's MSA (Doc. 19 at pg. 7). The ALJ did not commit legal error in his consideration of the medical opinions of record or in his treatment of the State Agency doctors' opinions. The analysis, *supra*, does away with Tina's argument that the limitations caused by her impairments were not included in the RFC finding. "As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). The Court can trace the path of the ALJ's reasoning from the medical evidence of record to his RFC finding, specifically the amount and extent of limitations he included therein. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (stating that an ALJ must provide a "logical bridge between the evidence and his conclusions").

**2**

Tina argues the ALJ's subjective symptom evaluation was erroneous for two discrete reasons. First, Tina argues that the ALJ's mention of the fact that Tina babysat twice a week, lived with her husband, did housework, and went to the grocery store was inadequate support for the ALJ's finding that Tina was not disabled. Second, she argues there was relevance to her medication non-compliance in that her non-compliance supported the alleged severity of her mental health symptoms and its interference with her capacity to perform sustained work. The Commissioner argues the ALJ made his symptom evaluation findings after considering the appropriate regulatory factors and focused on determining the intensity and persistence of Tina's symptoms and their impact on her functioning. SSR 16-3p directs the ALJ to focus on the "intensity and

persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016), *citing* SSR 16-3p.

SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain and other symptoms. SSR 16-3p, at *7-8.

The ALJ cited to evidence that Tina babysat her grandchildren in three instances. In support of his determination that the record supported the conclusion that Tina retained the ability to tolerate at least occasional interaction with coworkers, supervisors, and the general public, the ALJ cited evidence that Tina babysat her grandchildren. To support his finding that Tina was able to maintain some form of concentration and persistence and to understand instructions and procedures, he cited the evidence that she babysat her grandchildren, cooked, shopped, did dishes, vacuumed, and did housework. As partial support for his finding that APN Milhoan's opinions were entitled to no weight, the ALJ cited Tina's ability to babysit her grandchildren twice a week for an extended period of time as inconsistent with the extreme limitations to which Milhoan opined. In each of those three instances, the ALJ cited *more than* just the fact that Tina babysat her grandchildren to support his findings that she was not as limited by her mental health symptoms as she alleged.

Nothing in the ALJ's Decision suggests he improperly considered evidence that Tina babysat her grandchildren during the relevant period or that he placed

an undue emphasis upon that fact. Not only are daily activities a listed factor for consideration by an ALJ pursuant to 20 C.F.R. § 404.1529(c), SSR 96-8p reiterates that daily activities are ripe for consideration. *See* 96-8p (providing that an RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., *daily activities*, observations)") (emphasis added); *compare Jeske v. Saul*, 955 F.3d 583, 592 (7th Cir. 2020) ("An ALJ may not equate activities of daily living with those of a full-time job"). As in *Jeske*, here, the ALJ did not "reason [Tina's] activities of daily living are as demanding as those of full-time work. Rather, the ALJ considered [Tina's] activities to determine whether her symptoms were as severe and limiting as she alleged." *Id.* at 592-93. That is obvious from the a reading of the ALJ's Decision in this case in which he did not rely merely on evidence of Tina's babysitting, but also relied upon other daily activities she completed as well as medical evidence (for example, mental status examinations), and the efficacy of her medications (as reported by Tina). At the same time, the ALJ considered the treatment Tina received, her January 2017 psychiatric hospitalization for suicidal ideation, and the stressors that contributed to her symptoms. Though Tina takes issue with the fact the ALJ never questioned her at the hearing about babysitting, she *was* represented by counsel at that hearing. "[A] claimant represented by counsel is presumed to have made his best case before the ALJ[.]" *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). Her counsel also did not elicit her testimony on the subject of babysitting.

To the extent Tina suggests her medication non-compliance standing alone corroborated her allegations as to the intensity, persistence, and limiting effects of her mental health issues, she conveniently fails to acknowledge the totality of evidence the ALJ addressed with regard to her medication compliance. The ALJ several times discussed treatment notes which indicated Tina was not taking her

medications and she had a history of medication noncompliance. However, the ALJ also discussed that Tina reported she did not like her medication due to weight gain, she found her new medication effective but was worried about weight gain, and a March 29, 2016 progress note stated "No barriers to medication compliance identified." AR 30 (citing AR 1068).[4] Given that the ALJ's Decision had to be supported with substantial evidence, only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," the Court does not find the ALJ erred in his consideration of Tina's medication non-compliance at times. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). This is particularly so where the ALJ considered Tina's regular presentation to her doctor and therapist for treatment of her symptoms and her actual functioning throughout the time considered, and Tina does not point to anywhere in the record where medical providers indicated that her mental issues themselves caused medication non-compliance. Tina points out record evidence – circumstances *she* says are of the kind which lend themselves to the matter of an ability to maintain psychotropic medication compliance - which the ALJ did not cite in his Decision. Once again, the Court cannot reweigh the evidence. The ALJ was not required to discuss every piece of evidence, he was required to draft an opinion which permitted meaningful review. The Court is able to see how and why the ALJ found Tina's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical and other evidence in the record. *See Young*, 362 F.3d at 1002 (an ALJ must build and accurate and logical bridge so that a reviewing court "may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review").

---

[4] A March 9, 2016 progress note similarly stated, "No barriers to medication compliance identified." AR 1034.

**3**

Finally, Tina argues that the ALJ's Decision does not provide an accurate and logical bridge between the "paragraph B" criteria findings and RFC determination and the totality of the evidence. The Commissioner asserts the ALJ's comprehensive analysis renders this case different from others that reversed the ALJ's decision regarding a claimant's moderate limitations in concentration, persistence, or pace. Tina specifically challenges the ALJ's finding as to the following broad areas of functioning: interacting with others and concentrating, persisting, or maintaining pace.

Here, at Step Three, the ALJ cited the following evidence to support his conclusion that the record indicated Tina was able to function socially: Tina reported engaging in activities outside her home or with others; none of Tina's doctors noted Tina to be uncooperative or demonstrating inappropriate social behavior during her office visits; doctors noted Tina to be cooperative with an appropriate affect and demeanor; there was no record of evictions, altercations, police involvement, or severe social isolation; and Tina did not testify to any problems getting along with people when she was around them. Tina quotes State Agency Leslie Fyans, Ph.D.'s comment that, "[Tina] presents with mood and anxious reactivity and paranoid personality traits which may inhibit responding appropriately to supervisor criticism . . . ." AR 93. Dr. Fyans went on to explain that, "[Tina] has the ability to relate and communicate with others and tolerate work pressures. [Tina's] adaptive and interpersonal and cognitive resources are capable of doing one and two step unskilled tasks at sga." *Id*. The ALJ stated, "There is insufficient credible evidence to support a marked inability to interact appropriately with coworkers, the public, or supervisors." AR 26. He nevertheless gave Tina "the benefit of the doubt with regard to her purported problems with social functioning" by limiting her contact with supervisors, coworkers, and the

general public to occasional contact. *Id*. Both Dr. Fyans' *entire* explanation in support of her opinion and the ALJ's explanation in support of his finding that Tina was moderately limited in interacting with others undermines Tina's assertion that the ALJ's decision was silent as to this aspect of her functioning. An opinion that a claimant's traits "*may*" inhibit appropriate response to supervisor criticism when coupled with an *actual* limitation in supervisor interaction in the RFC undermines a contention of error.

At Step Three, the ALJ cited the following evidence to support his conclusion that Tina did not present credible evidence to substantiate a marked degree of limitation in the area of concentration, persistence, or pace from a longitudinal perspective: Tina was able to concentrate, attend, and persist long enough to cook meals, grocery shop, do dishes, vacuum, do housework, and care for her grandchildren; and her mental status examinations showed she had intact attention. The ALJ determined such evidence demonstrated an ability to maintain concentration and focus for some extended period of time. He made obvious that such evidence outweighed the evidence in a doctor's note that "during a manic phase . . . [Tina] was 'distractible.'" AR 26 (citing AR 1035). Later in the Decision and after a discussion of Tina's mental health records, the ALJ explained Tina's "symptom exacerbations appear to be transient and expectable reactions to psychosocial stressors including discord with her teenage son and her husband being diagnosed with cancer." AR 32. The ALJ earlier discussed Dr. Bitar's August 2015 progress note that Tina reported she was not doing well and reported she lost her job. The ALJ highlighted that throughout 2016 and 2017, Tina continued to report she was not doing too badly, she was very active, her depression was well controlled, she did not want to change her medications, and she was doing well.

The hypothetical must "explicitly account for" deficiencies in concentration, persistence, or pace. *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019). Here,

21

Tina argues the ALJ's limitation of simple, routine and repetitive tasks with only simple work-related decisions did not sufficiently address the instability caused by her mental illness (its waxing and waning) nor the amount of sleep she reported she needed to function. While Tina cites to psychiatric hospitalization that pre-dated her alleged onset date, the ALJ emphasized that Tina did not have "multiple, extended psychiatric hospitalizations or even ER visits since her alleged onset date." AR 31. He further emphasized that upon Tina's one hospitalization in January 2017 for suicidal ideation, after medication adjustment and therapy, "treatment notes confirm dramatic improvement in a short amount of time and she was discharged home." *Id*. As discussed, *supra*, the ALJ considered the stressors that exacerbated Tina's mental health symptoms. Indeed, the ALJ pointed out that it was noted Tina was having significant discord with her teenage son at the time of her January 2017 psychiatric hospitalization. The ALJ *did* consider the waxing and waning nature of Tina's mental illness insofar as he considered her symptom exacerbation was "transient" as it was a reaction to stressors.

True, the ALJ did not delve into Tina's sleep patterns, but that one omission does not render insufficient the discussion of the evidence the ALJ provided in support of his limitation to simple, routine, repetitive work with simple work-related decisions. Tina argues a limitation to work that involves simple, routine, and repetitive tasks is not a panacea to findings of limitations in concentration, persistence, or pace. Nor is a limitation to work that involves simple, routine, and repetitive tasks per se insufficient under Seventh Circuit precedent addressing the question of whether an ALJ has sufficiently included moderate limitations in concentration, persistence, or pace in the RFC and hypothetical to the VE. As Tina recognizes in her brief, "As a matter of form, the ALJ need not put the questions to the VE in specific terms – there is no magic words requirement." *Crump v. Saul*,

932 F.3d 567, 570 (7th Cir. 2019). His analysis of the medical, subjective, and daily activity evidence of record made clear how the ALJ's limitation of simple, routine, repetitive work with simple work-related decisions accounted for Tina's particular problems of concentration, persistence, or pace.

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 15) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 18) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, Tina C., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on June 23, 2020.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE